UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MZ WALLACE INC.<br>                    Plaintiff,<br><br>           v.<br><br>SUE FULLER, D/B/A THE OLIVER THOMAS, and BLACK DIAMOND GROUP, INC.<br>                    Defendants. | No. 18 CV 02265 (DLC) |
| BLACK DIAMOND GROUP, INC.<br>                    Counterclaim<br>                    Plaintiff,<br><br>           v.<br><br>MZ WALLACE INC.,<br>                    Counterclaim<br>                    Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION IN LIMINE TO PRECLUDE TESTIMONY OF HAL PORET</u>**

**I.      INTRODUCTION**

Defendants' expert Hal Poret should not be permitted to offer testimony about the secondary meaning of MZ Wallace's trade dress at trial because his opinions derive exclusively from a survey so polluted with data collection error that it cannot form the basis of any reliable expert opinion.

The error lies with the fact that Mr. Poret's team wrongly programmed the survey software and Mr. Poret never caught the error. His lack of oversight resulted in the survey's data file having *seven* slots available to receive data for questions that only had *six* potential

responses. When these questions were asked, according to Mr. Poret, the software "wasn't sure what to do" with the responses and inexplicably and inconsistently wrote data to all seven slots. Practically speaking, what this means is that any effort to match the data with the respondents' answers to the survey questions amounts to nothing more than guesswork.

Simply put, Mr. Poret's error and fundamental lack of oversight in basic quality control render the survey data totally meaningless. Opinions based on such unreliable data necessarily fall short of the scientific rigor demanded by the Federal Rules of Evidence and these opinions must be excluded.

## II.     RELEVANT FACTUAL BACKGROUND

In the spring of 2018, Defendants engaged Hal Poret to design and conduct an internet survey to test the secondary meaning of the MZ Wallace Trade dress. Transcript of October 25, 2018 Deposition of Hal Poret ("Poret Dep.") at 374. Select pages of the Poret Dep. are annexed to the Declaration of Adam B. Michaels, submitted herewith, ("Michaels Decl.") at Exhibit A.

Mr. Poret authored a written survey questionnaire, which included, among other things, programming instructions for FocusVision, the third-party Mr. Poret enlisted to code the survey software, host and administer the survey on its website, and collect the respondents' data. Poret Dep. at 9 - 10, 217.

For Mr. Poret, the relevant survey universe was prospective consumers of MZ Wallace's Metro Tote, so to create the sample, in addition to basic demographic qualifiers, the questionnaire asked respondents if they had purchased a certain type of bag or were likely to do so. Poret Dep. at 126, 132-33, 182-83; Expert Report of Hal Poret, dated Sept. 14, 2018 ("Poret Report") at 49. A copy of the Poret Report is annexed to the Michaels Decl. at Exhibit B.

-3-

> **ASK IF: HAS NOT TERMINATED**
> Q125  In the past 12 months, which of the following, if any, have you personally purchased?
>
> (Select all that apply)
> [RANDOMIZE]
> 1. Tote or other shoulder bag
> 2. Backpack
> 3. Purse or clutch
> 4. Pouch or wallet
> 5. Crossbody bag
> 6. None of these [ANCHOR; EXCLUSIVE]
>
> **ASK IF: HAS NOT TERMINATED**
> Q130  In the next 12 months, which of the following, if any, are you likely to personally purchase?
>
> (Select all that apply)
> [REPEAT SAME LIST OF OPTIONS AS SHOWN IN Q125 IN SAME ORDER]
>
> [MUST SELECT OPTION 1 IN Q125 AND/OR Q130 TO CONTINUE; OTHERWISE, TERMINATE.]

Poret Report at 49.

As the questionnaire shows, Questions Q125 and Q130 presented six answer response options and required the respondents to select "Tote or other shoulder bag" in order to qualify and avoid being terminated from the survey. The Poret Report likewise indicates that the survey provided six answer response options for Q125 / Q130 to qualify respondents.

| [Q125] In the past 12 months, which of the following, if any, have you personally purchased? | All |
|---|---|
| Total | N=200 |
| Tote or other shoulder bag | 70%<br>139 |
| Backpack | 43%<br>85 |
| Purse or clutch | 58%<br>116 |
| Pouch or wallet | 50%<br>99 |
| Crossbody bag | 47%<br>94 |
| None of these | 7%<br>14 |

| [Q130] In the next 12 months, which of the following, if any, are you likely to personally purchase? | All |
|---|---|
| Total | N=200 |
| Tote or other shoulder bag | 80%<br>159 |
| Backpack | 31%<br>61 |
| Purse or clutch | 53%<br>106 |
| Pouch or wallet | 37%<br>73 |
| Crossbody bag | 37%<br>73 |
| None of these | 3%<br>5 |

Poret Report at 17.

The problem is that the actual data set tells a different story. This electronic document, which Mr. Poret did not provide with his report and which was only furnished upon Plaintiff's specific request for it, indicates that when these fundamental qualification questions were posed to the respondents, <u>seven</u>, not <u>six</u>, answer response options were available for the respondents to select. A copy of the electronic data set, *Poret Report Appendix D.xlsx*, ("Data Set") is submitted as Exhibit C to the Michaels Decl.

The data map in the Data Set identifies those seven response options as follows:

| Q125: In the past 12 months, which of the following, if any, have you personally purchased? | | |
|---|---|---|
| Values: 0-1 | | |
| | 0 | Unchecked |
| | 1 | Checked |
| | [Q125r1] | Tote bag |
| | [Q125r2] | Other shoulder bag |
| | [Q125r3] | Backpack |
| | [Q125r4] | Purse or clutch |
| | [Q125r5] | Pouch or wallet |
| | [Q125r6] | Crossbody bag |
| | [Q125r7] | None of these |

| Q130: In the next 12 months, which of the following, if any, are you likely to personally purchase? | | |
|---|---|---|
| Values: 0-1 | | |
| | 0 | Unchecked |
| | 1 | Checked |
| | [Q130r1] | Tote bag |
| | [Q130r2] | Other shoulder bag |
| | [Q130r3] | Backpack |
| | [Q130r4] | Purse or clutch |
| | [Q130r5] | Pouch or wallet |
| | [Q130r6] | Crossbody bag |
| | [Q130r7] | None of these |

Likewise, the raw data in the Data Set shows seven separate data fields for Q125 (Q125r1, Q125r2, Q125r3, Q125r4, Q125r5, Q125r6, and Q125r7) and seven separate data fields for Q130 (Q130r1, Q130r2, Q130r3, Q130r4, Q130r5, Q130r6, Q130r7), which correspond to the response options in the data map. Data Set: A1: Columns AC-AP. Furthermore, these fourteen data fields are all populated with survey data.

When presented with the discrepancy between the Data Set and his questionnaire/report, Mr. Poret's reaction was disbelief, exclaiming that "someone could have messed around with this." Poret Dep. at 221.

After taking a long break to study the discrepancy, Mr. Poret returned to the deposition to advise he had figured out what happened. He disclosed for the first time that there had been a draft questionnaire that indeed did have seven answer choices for Q125 and Q130 and that in the draft questionnaire "tote" and "other shoulder bag" were broken out as separate choices. Poret Dep. at 246. However, he vehemently and repeatedly denied that the respondents

who took the survey were presented with the draft versions of Q125 and Q130 that had seven answer choices, rather than six. Poret Dep. at 223, 231, 245.

Instead, Mr. Poret offered a convoluted explanation that (i) the survey software must have been miscoded with a "relic" of a former iteration of the survey; (ii) that this programming error resulted in the creation of an "extra" or "phantom" column in the data file; and (iii) that this "extra" or "phantom" column somehow became populated with data when the survey was run. Poret Dep. at 225, 227. Mr. Poret said he was able to figure out what went wrong on his own and without the need to consult with FocusVision or any of the people who helped him with the survey. Poret Dep. at 235-36, 240. Although he acknowledged this was an error he did not catch, Mr. Poret brushed any concern aside and said that this is "the kind of error that happens all the time in surveys." Poret Dep. at 235, 245, 250.

As for the specifics of his explanation, when asked to identify which column in the date set was the "phantom" or "extra" one, Mr Poret could not do so. Poret Dep. at 228, 233. When asked how the "phantom" column ended up being written with data, Mr. Poret opined that the software "wasn't sure what to do." Poret Dep. at 229, 239.

Undeterred, Mr. Poret indicated that *he* was sure what happened and that he could derive meaning from the data set despite the software glitch, the phantom column, and extra data. According to him, when the software confused the data, it only did so with respect to the R1 and R2 fields for Q125/Q130, with the other fields remaining intact. Poret Dep. at 228-29, 231. Furthermore, according to Mr. Poret, the R1 and R2 data fields need to be read together because, in his view, they both correlate to the singular "tote or other shoulder bag" response choice for Q125/Q130. Poret Dep. at 238. He explained that when a respondent selected "tote or other shoulder bag," the data for this response was allocated to both the R1 and R2 columns. Poret

Dep. at 226-28, 231 ("it looks like for the first choice 'tote or other shoulder bag,' it had two columns into which it could put that answer."). He further explained that a "1" value in either R1 or R2 or both on the Q125/Q130 question indicates that the respondent selected "tote or other shoulder bag" as a response. Poret Dep. at 239.

If Mr. Poret's convoluted explanation were correct, then one would expect to see some uniform treatment among the R1 and R2 values throughout the data set for Q125/Q130. But these data values are totally inconsistent. Some respondents show a "1" in R1 and a "0" in R2, others show a "0" in R1 and a "1" in R2, and others still show a "1" in both R1 and R2. Poret Dep. at 238-40. These inconsistencies are irreconcilable with Mr. Poret's explanation that the allocation went into R1 or R2.

When asked why the glitch in the software would have distributed the respondents' "tote or other shoulder bag" response so inconsistently across R1 and R2, Mr. Poret had no concrete answer, but speculated that it may have something to do with randomization. Poret Dep. at 242-43. And when asked how one could verify that his explanation for the discrepancy in the data was accurate, he said he did not know. Poret Dep. at 244.

### III.   ARGUMENT

Under F.R.E. 702, a properly qualified expert may offer scientific or technical opinions only if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness applies the principles and methods reliably to the facts of the case. While shortcomings in surveys typically affect the weight of the survey, not its admissibility, there are occasions where the proffered survey is so flawed that it is completely unhelpful to the trier of fact and inadmissible. That is the case here. The question before the Court is not whether the design of the Poret survey adequately comports

with proper survey design methodology. Rather the question is whether the data collection process Mr. Poret employed meets a minimal level of competence and reliability. This is an issue of quality control, not methodology.[1]

The following facts regarding the data collection for this survey are incapable of dispute:

- Mr. Poret's team made an error when programming the survey;

- The programming error was overlooked by Mr. Poret and his staff;

- The survey was administered with the programming error;

- The programming error resulted in a discrepancy between the data that was collected, as reflected in the Data Set, and Mr. Poret's analysis and conclusions, as reflected in the Poret Report;

- This programming error affected the data for the threshold substantive qualifier questions that Mr. Poret employed to derive a survey sample purportedly representative of the relevant universe;

- More specifically, the programming error affected the very fields, at least according to Mr. Poret, that correlate to the answer response choice ("tote or other shoulder bag") that Mr. Poret used to <u>qualify</u> individuals for the survey sample.

Mr. Poret has offered an explanation for the data discrepancy that does not hold water. Software does not behave the way in which he claims and he admits he does not know

---

[1] The many methodological flaws with his survey design, including his improper stimulus, improper sampling and ambiguous questions, will be explored with Mr. Poret at trial, if he is permitted to testify.

how one could verify that his explanation for the discrepancy is the correct one.  No reasonable scientist would proffer a survey based on data so tainted with error.

The Reference Manual for Scientific Evidence instructs that "[p]rocedures for data entry should include checks for completeness, checks for reliability and accuracy, and rules for resolving inconsistencies." Reference Manual on Scientific Evidence, Third Edition (Federal Judicial Center 2011) ("Reference Manual") at 412-13.  Further, the law in this Circuit is clear that the trustworthiness of a survey depends upon a demonstration by its proponent that, among other things, "the data gathered was accurately reported." *See, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007).  Put simply, data cannot be meaningful if its collection was not reliable.  In light of the above, this is a burden that Defendants simply cannot meet.  Mr. Poret's survey research lacks scientific rigor and fails to adhere to basic scientific principles at the most basic level.  His opinions based on this survey must be excluded.

## IV.     CONCLUSION

For these reasons, the Court should preclude Defendants from offering the expert opinion testimony of Hal Poret at the trial of this matter.

Dated:  November 16, 2018                         **HAND BALDACHIN & ASSOCIATES LLP**

By:  */s/Adam B. Michaels*
Marc S. Reiner
  mreiner@hballp.com
Adam B. Michaels
  amichaels@hballp.com
8 West 40th Street, 12th Floor
New York, New York 10018
(212) 956-9500
Fax: (212) 376-6080

*Attorneys for Plaintiff and Counterclaim Defendant MZ Wallace, Inc*