David H. Bernstein (dhbernstein@debevoise.com)
Christopher S. Ford (csford@debevoise.com)
Olena V. Ripnick-O'Farrell (ovripnickofarrell@debevoise.com)
Kathryn C. Saba (ksaba@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6696

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
MZ WALLACE INC.,                                             :
                                                             :
                          Plaintiff,                         :
                                                             :
            v.                                               :      No. 18 CV 02265 (DLC)
                                                             :
SUSAN FULLER D/B/A THE OLIVER                                :
THOMAS, and BLACK DIAMOND GROUP,                             :
INC.,                                                        :      **DECLARATION OF SARAH**
                                                             :      **BUTLER**
                          Defendants.                        :
                                                             :
-------------------------------------------------------------:
                                                             :
BLACK DIAMOND GROUP, INC.,                                   :
                                                             :
                          Counterclaim                       :
                          Plaintiff,                         :
                                                             :
            v.                                               :
                                                             :
MZ WALLACE INC.,                                             :
                                                             :
                          Counterclaim                       :
                          Defendant.                         :
                                                             :
-------------------------------------------------------------x

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 3

EXPERT QUALIFICATIONS .................................................................................... 3

SURVEY OVERVIEW ............................................................................................... 4

SURVEY DESIGN ...................................................................................................... 6

    Material Considered and Understanding of the Facts ............................................ 6

    The *Eveready* Survey Format Was the Appropriate Format ................................ 7

    I Followed Accepted Principles in Designing My Survey ..................................... 9

    The Internet Panel Was Reliable .......................................................................... 9

    The Proper Universe Was Surveyed .................................................................. 10

    A Representative Sample Was Drawn from the Universe ................................... 14

    My Survey Used an Appropriate Stimulus ........................................................ 17

    The Questions Asked Were Fair and Unbiased ................................................. 23

    The Results of the Survey Show Zero Confusion .............................................. 24

    I Did Not Need a Control Group for My Survey ............................................... 27

    I Utilized Industry-Standard Quality Control Measures .................................... 28

    Summary of My Conclusions ............................................................................. 28

## INTRODUCTION

1.      I am Chair of the Survey and Sampling Practice at NERA Economic Consulting. I designed and conducted a scientifically designed consumer perception survey to evaluate whether Oliver Thomas products are likely to cause consumers to be confused into believing that Oliver Thomas products are made by, affiliated or associated with, or created or sold with the permission of, Plaintiff MZ Wallace.  As I will explain in my testimony below, I have concluded, based on the results of this survey, that the appearance of Oliver Thomas handbags – including their use of one-inch quilting, positioned at a 45-degree angle, covering all or substantially all of the bag – is not likely to cause any consumer confusion.

## EXPERT QUALIFICATIONS

2.      I am a Managing Director at NERA Economic Consulting, where I am also Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices.  I initially worked at NERA as a Research Associate from 1998 until 2002, and then re-joined the company in 2003, as a Senior Analyst.  I have been with NERA since 2003 and I conduct survey research, market analysis, and sampling analysis on a wide range of topics regarding business and consumer decision making, consumer choice, and consumer behavior.  During my time at NERA, I have designed and supervised more than 300 consumer perception surveys, including more than 150 in connection with trademark and trade dress litigations.

3.      I am a member of the American Association of Public Opinion Research, the American Statistical Society, the Intellectual Property Section of the American Bar Association, and the International Trademark Association.  I have authored approximately 10 publications on consumer perception surveys, and I have taught research methodology courses (which included survey research) to graduate and undergraduate students.  I obtained a Bachelor of Arts in

sociology and history from Wellesley College in 1995; a Masters in Philosophy from Trinity

College, Dublin Ireland in 1997; a Master of Arts in sociology from Temple University in 2000;

and a separate degree in applied sociology from Temple University in 2005.

4.      I have testified at deposition and/or in trial about consumer perception surveys, in

approximately 18 trademark and trade dress cases, including in the U.S. District Court for the

Southern District of New York.  I have been qualified as an expert on consumer perception

surveys in every case where I have been proffered as an expert, in more than 10 trials and

hearings.

## SURVEY OVERVIEW

5.      I understand that Plaintiff MZ Wallace contends that consumers exposed to Oliver

Thomas' bags are likely to be confused into believing that they come from, or are sponsored or

approved by, MZ Wallace because of the use of the quilting on the exterior of the bag –

specifically, quilting that is allegedly similar to MZ Wallace's 7/8" quilting, set at a 45-degree

angle and covering all or substantially all of the bag.  In order to scientifically test that

proposition, I designed and conducted a likelihood of confusion survey among likely purchasers

of the kinds of bags sold by Oliver Thomas (which, as I will explain below, is the proper

universe for a likelihood of confusion survey).  To ensure that the sample in my survey was

representative, I surveyed women who are 18 years of age and older, living in the United States,

across a broad range of age groups, who indicated that they were likely to purchase handbags

like those sold by Oliver Thomas.  To ensure the results of my survey were robust and reliable, I

included 200 women in the survey.

6.      As I will explain further below, the stimulus used in my survey was the Oliver

Thomas Wingwoman Tote in the basket weave pattern.  I selected this product for the survey

because, in the Complaint, MZ Wallace specifically highlights this product as "bearing a striking

resemblance" to the MZ Wallace Metro Tote in basket weave, a product that is cited in the Complaint as exemplary of MZ Wallace's claimed trade dress.[1]  Once respondents in my survey were qualified as potential purchasers of the types of bags at issue in this case, the respondents were shown a series of images of the Oliver Thomas Wingwoman Tote from several angles and then were asked the key survey questions, including who put out the bag, whether the company that made or put out the bag was affiliated with any other companies, and whether the company that made or put out the bag had permission or approval from any other companies.  These are the standard "*Eveready*" questions that have long been used to test for confusion in trademark and trade dress cases.

7.     The results of my survey were definitive:  not a single person was confused into believing that the Oliver Thomas bag came from, or was affiliated with, or was sold with the permission of, MZ Wallace.  In fact, not one of the 200 women in my survey mentioned MZ Wallace at all.  In my expert opinion, based on my knowledge and experience and the results of this survey, I believe that consumers are not at all likely to confuse Oliver Thomas products with MZ Wallace, or specifically, to be confused as to the source or sponsorship of Oliver Thomas products in the real world.

8.     In the sections below, I will discuss the survey design and results in detail.  I also will respond to comments made by Dr. Thomas J. Maronick, who was engaged by MZ Wallace to critique my survey; I will explain why I believe his comments are irrelevant and do nothing to undermine the conclusions I have drawn based on the results of my survey.

---

[1]     Complaint, ¶¶ 13, 24.

## SURVEY DESIGN

### Material Considered and Understanding of the Facts

9.      In preparing my survey, I reviewed substantive pleadings in this case, in particular the Complaint, so that I could understand the nature of MZ Wallace's claims.  I also reviewed the Oliver Thomas and MZ Wallace websites, along with the websites of certain retailers (like Nordstrom), to understand what products were offered and the price points at which those products were offered.

10.      I understand that Oliver Thomas manufactures handbags and accessories that are generally priced between $35 and $109 (at retail) and sold through third-party retail boutiques and online at the Oliver website, located at www.theoliverthomas.com.  Based on my review of MZ Wallace's Complaint and other materials (including discovery materials produced in the litigation), I understand that MZ Wallace sells its merchandise in high-end department stores like Nordstrom and Saks Fifth Avenue, in select boutiques, as well as on its website, located at www.mzwallace.com.  In the Complaint, MZ Wallace alleges that it has trade dress rights in a pattern consisting of (1) a nylon bag; (2) with a quilted grid; (3) of 7/8-inch squares; (4) placed at a 45-degree angle with a corner facing downward; (5) with squares covering all or substantially all of the bag (the "Alleged Trade Dress").[2]  MZ Wallace stated that its Alleged Trade Dress has "achieved great renown in the United States" and makes its bags "instantly recognizable as originating from MZ Wallace." [3]  The Complaint specifically calls out the Metro Tote bearing a basket weave pattern as an "excellent example" of a product bearing the Alleged Trade Dress and specifically notes that the Oliver Thomas Wingwoman Tote in the basket weave pattern

---

[2]      Complaint, ¶ 11.

[3]      *Id.*, ¶ 1, 13.

bears "a striking resemblance" to MZ Wallace's Metro Tote.[4]  All of this information informed the manner in which I designed my survey and selected my stimuli.

## The *Eveready* Survey Format Was the Appropriate Format

11.     Broadly speaking, there are two types of surveys that are typically done to measure a likelihood of confusion.  One type of survey, known as an *Eveready* survey (based on the type survey done in *Union Carbide Corp. v. Ever-Ready, Inc.*[5]), is a monadic survey that shows consumers the defendant's product and asks respondents questions to elicit whether respondents believe that the defendant's products come from, or are affiliated with or sponsored by, the plaintiff.  An *Eveready* survey is often described as the "gold standard" for measuring whether confusion is likely because it is a format that is not suggestive as to a potential relationship between products and is grounded in empirical testing and theory.

12.     A second type of survey that is sometimes used to measure confusion is a *Squirt* survey (based on the type of survey done in *Squirtco v. Seven-Up Co.*[6]).  Unlike the monadic approach of an *Eveready* survey, a *Squirt* survey offers a direct comparison – it shows respondents both the plaintiff's and defendant's products and asks questions designed to elicit whether respondents believe the products come from the same source.  It is widely accepted among survey experts and courts that a *Squirt* survey is not appropriate unless the products are sold side by side, or in close proximity, in the marketplace; otherwise, showing the products side by side in the survey would be artificially leading and would fail to replicate the way in which

---

[4]     *Id.*, ¶¶ 13, 24.

[5]     531 F.2d 366, 385-88 (7th Cir. 1976).

[6]     628 F.2d 1086, 1089, n.4, 1091 (8th Cir. 1980).

the products typically appear in the marketplace (and thus would fail to measure the actual

reactions consumers typically would have in the marketplace).[7]

13.     I understand that Oliver Thomas and MZ Wallace products are typically not sold

in the same stores.  Oliver Thomas sells its products at www.theoliverthomas.com and in select

boutiques; MZ Wallace sells its products through its dedicated stores, at www.mzwallace.com,

through high-end department stores, and in select boutiques.  Although the parties both sell their

products in boutiques as a type or channel of trade, the parties' products do not appear in the

same boutique stores.  In other words, simply saying MZ Wallace and Oliver Thomas are sold in

"boutiques," provides no information about the relative proximity of the products in actual

marketplace conditions.  I understand that these products are not sold in the same boutiques;

indeed, I understand that MZ Wallace has sent a letter to all of its retailers indicating that it

would refuse to sell to any stores that also sell Oliver Thomas products.[8]  Given that the parties'

products are not sold in close proximity, the *Eveready* survey format, an appropriate and

accepted format to use in this case, is the only reliable format choice.

14.     I understand that MZ Wallace has asserted, through the testimony of Dr.

Maronick, that I should have used a *Squirt* survey.  Because the parties' products are not sold in

the same stores, and consumers do not proximately encounter the products at issue in the

marketplace, a *Squirt* survey would be entirely inappropriate.[9]

---

[7]     J.B. Swann, *Likelihood of Confusion*, in TRADEMARK AND DECEPTIVE ADVERTISING
SURVEYS:  LAW, SCIENCE, AND DESIGN 70 (S.S. Diamond & J.B. Swann eds., 2012).

[8]     Ex. D61, MZW 6183.

[9]     Swann, *Likelihood of Confusion*, at 70.

## I Followed Accepted Principles in Designing My Survey

15.     Based on my knowledge and experience, as well as my review of relevant authorities, the design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.  In general, the design of a reliable survey requires careful attention to the following key areas:

- the definition of the relevant population;

- the procedures for sampling from the relevant population;

- the survey questions used;

- the stimuli shown to respondents; and

- the protocol for calculating the results from the survey.[10]

I considered each of these key areas in designing my survey.

## The Internet Panel Was Reliable

16.     In general, the use of Internet panels to collect survey data has replaced in-person and landline phone interviewing.  As shopping mall traffic declines and households replace home phones with individual mobile phones, researchers have sought a reliable alternative for accessing large numbers of diverse consumers.  Internet panels allow researchers to locate and sample from millions of U.S. consumers; this means of identifying a sample population enhances

---

[10]     S.S. Diamond, *Reference Guide on Survey Research*, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 359, 376-412 (2011), https://www.fjc.gov/sites/default/files/2015/ SciMan3D01.pdf.; *see also*, the *Manual for Complex Litigation, Fourth Edition* (2004), which phrases these key areas as such:

- the population was properly chosen and defined;

- the sample chosen was representative of that population;

- the data gathered were accurately reported; and

- the data were analyzed in accordance with accepted statistical principles.  (at p. 103).

the reliability of survey research.  The reliability of online survey research is due in part, to the ability to randomly select from large pools of potential respondents whose characteristics are diverse and often more broadly representative of a total population than would be the characteristics of respondents from a few selected geographic locations.

17.     I used a well-known and reputable online panel provider, Critical Mix.  Critical Mix has been providing sample and hosting internet surveys for over 10 years.  Critical Mix uses a number of quality controls to ensure its panel respondents are of the highest quality.  For example, to ensure that the appropriate individual is surveyed, panel members must go through a two-step verification to sign on and access surveys.  I have worked with Critical Mix on close to 100 survey projects.

### The Proper Universe Was Surveyed

18.     Another critical step in the design of any survey is to define the relevant universe. In this instance, I determined that the relevant population is women 18 years of age and older, living in the United States, who have or would purchase the types of bags sold by Oliver Thomas, at the relevant price points, in a boutique, local store or store specializing in bags.  This is the relevant population because this is the market of potential consumers of Oliver Thomas products who could potentially see and purchase the allegedly infringing goods.

19.     I limited respondents to women because Oliver Thomas products are primarily marketed to and sold to women.  Although it is possible that some men purchase Oliver Thomas products, perhaps for themselves or as gifts, I understand from Oliver Thomas that the vast majority of its consumers are women.  In my professional opinion, limiting the survey to women was a conservative decision because I suspect that men are less familiar than women with the MZ Wallace line of bags, and thus men would be even less likely than women to confuse Oliver Thomas products as coming from, or being affiliated with or sponsored by, MZ Wallace.

10

20.     To ensure that the proper universe of respondents was included in my survey, I incorporated a series of screening questions into my questionnaire.  The use of screening questions is standard and appropriate in order to ensure that the respondents are part of the relevant population.  Trial Exhibit D175-C is a true and correct copy of the questionnaire that I used in this case.

21.     Respondents were first asked a screening question about what industry they and members of their household work in.  If anyone indicated that they or a member of their household worked for a company that makes or manufactures accessories like jewelry or bags, they were excluded from the survey.  This type of question is a standard screening mechanism to ensure that the respondents are ordinary shoppers, rather than industry insiders who may have special or unique knowledge about the product category.  As is standard in the industry, respondents were also screened out of the survey if they or a member of their household works in market research or for an advertising company.[11]  This is standard practice because it is important to exclude respondents who might have specialized knowledge that would make their responses atypical of the ordinary consumer.

22.     Respondents were next asked about any surveys taken in the past three months.  If a respondent had taken a survey on women's accessories, such as jewelry or bags, in the past three months, she was screened out.[12]  This is also a standard screening approach in surveys; it is designed to ensure that respondents' answers to my survey are not influenced by some other recent survey on a similar topic.

---

[11]     Ex. D175-C.

[12]     *Id.*

23.     After these initial screening questions, respondents were asked a series of questions designed to identify potential consumers of Oliver Thomas products.  For example, respondents were asked whether they had purchased a tote, duffel bag, crossbody bag, fashion backpack, wallet, laptop bag/briefcase, or suitcase in the past six months, or were likely to purchase those types of bags in the next six months.  In order to continue in the survey, respondents had to indicate that they had purchased or were likely to purchase a tote bag, a crossbody bag, or a fashion backpack.[13]  These products were selected because in its Complaint, Plaintiff alleges that the Oliver Thomas tote bag, crossbody bag, and fashion backpack designs have "used identical, or if not identical, confusingly similar designs to Plaintiff's."[14]

24.     Qualified respondents were next asked to indicate the types of stores, either online or in person, where they are likely to shop for the qualifying bag types (*i.e.*, tote, crossbody, or fashion backpack).  This list included:  a department store, a boutique or local store, a store for a specific handbag brand, or a mass merchandise store.[15]  To continue, respondents had to indicate they are likely to shop in a "boutique or local store" and/or "a store for a specific handbag brand," as these are the outlets through which Defendants' bags are sold.  (I understand that Oliver Thomas bags are not sold in department stores or in mass merchandise stores.)  Respondents could have indicated that they shopped in other types of stores.

25.     I understand that Dr. Maronick has criticized the universe that I selected and indicated it was the wrong universe for my survey.  I understand that he claims that, by limiting respondents to those who have shopped at "boutiques or local stores," I have "eliminate[d]

---

[13]   *Id.*

[14]   *Complaint*, ¶¶ 23-26.

[15]   Ex. D175-C.

women who shop at major retailers where they might encounter MZ Wallace," and have "assure[d] there is no familiarity (top-of-mind awareness of) of the MZ Wallace brand."  This criticism is baseless and reflects a fundamental misunderstanding of the proper universe in a likelihood of confusion survey.

26.     **First**, Dr. Maronick's critique assumes that the proper universe should be the potential consumers of MZ Wallace products.  That is not correct.  In a case measuring the likelihood of confusion, the test is whether potential purchasers of the defendant's products – here the potential purchasers of Oliver Thomas products – will be likely to be confused when they encounter Oliver Thomas products in the marketplace.  This is a basic principle in likelihood of confusion surveys.[16]  That Dr. Maronick does not understand this basic proposition of likelihood of confusion surveys raises questions about his knowledge of survey methodology and analysis, as well as his qualifications as a survey expert.

27.     **Second**, and in any event, Dr. Maronick's criticism is factually incorrect.  My survey did not eliminate women who shop at major retailers like department stores; indeed, many of the women in my survey indicated that they do shop at department stores.  Rather, to qualify as a respondent in my survey, women had to indicate that they would shop at a "boutique or local store" and/or "a store for a specific handbag brand."  As long as they indicated they would shop in one of those retail channels – which are the channels where Oliver Thomas bags are sold – women qualified to be respondents in my survey even if they also indicated that they shopped at "a department store."  In fact, a total of 158 out of the 200 respondents selected both a choice qualifying them for the survey (that is, a boutique or local store or a store for a specific

---

[16]   William G. Barber, *The Universe*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW, SCIENCE, AND DESIGN 28-29 (S.S. Diamond & J.B. Swann eds., 2012).

handbag brand), as well as the option indicating that they shopped at "department store[s]." As a result, I did not exclude women who shopped at department stores.

28.     Moreover, if I were to evaluate the results of the survey only amongst these respondents who also indicated that they would shop for such bags at department stores, the level of confusion would still be zero. There is, therefore, no reason to believe that women who indicated that they are likely to shop for such a bag at a department store are any more likely to be confused than women who shop at boutiques or stores for specific brands (such as the Oliver Thomas website).

29.     My final screening question asked about how much respondents had spent or were likely to spend on the products at issue. There was a separate question each for totes, crossbody bags, and fashion backpacks, and respondents were presented with a range of price choices. Respondents qualified for the study if they indicated that they had purchased or were likely to purchase a tote bag for $99 or more; a crossbody bag for $49 or more; and/or a fashion backpack for $89 or more.[17] The logic supporting these screening questions is that a respondent must be willing to spend at least the price of an Oliver Thomas product in order to be a potential Oliver Thomas consumer. Based on my review of the Oliver Thomas website, I determined that the Oliver Thomas Wingwoman Tote is sold for $99.00, the Oliver Thomas 24 + 7 Cellphone Crossbody is sold for $49.00, and the Oliver Thomas 24 + 7 Small Backpack is sold for $89.00. The price cutoffs for inclusion in my survey correspond to these Oliver Thomas prices.

## A Representative Sample Was Drawn from the Universe

30.     Once the proper universe has been identified, it is important to draw a representative sample from the universe to ensure that the respondent pool reflects the views of

---

[17]   Ex. D175-C.

consumers in different demographic groups.[18]  For example, if all the women in the survey were

over 65 years old, the survey results would tell me nothing about how younger women may react

to the product being tested.

31.     In order to ensure a representative sample, survey invitations were sent to a

random sample of all women on the panel over the age of 18.  This random selection ensured

that my survey population includes women of various ages and from all four of the U.S. Census

Regions.  The demographic characteristics of my survey respondents are reflected below:

**Table 1. Age Distribution of Survey Respondents**

| Age Group | Count | Percent |
|---|---|---|
| 18-34 | 54 | 27.0% |
| 35-54 | 71 | 35.5% |
| 55+ | 75 | 37.5% |
| **Total Respondents** | **200** | **100.0%** |

**Table 2. Geographic Distribution of Survey Respondents**

| Census Region | Count | Percent |
|---|---|---|
| Northeast | 44 | 22.0% |
| Midwest | 51 | 25.5% |
| South | 69 | 34.5% |
| West | 36 | 18.0% |
| **Total Respondents** | **200** | **100.0%** |

32.     I understand that Dr. Maronick has claimed that I selected the wrong sample.  I

further understand that Dr. Maronick argues that I should have focused on respondents from

metropolitan areas (since that is where the major department stores that sell MZ Wallace

---

[18]     Barber, *The Universe*, at 47-49.

products are located), as well as respondents from California, Florida, New Jersey, and New York (since that is where over half of MZ Wallace sales occurred). This criticism is baseless.

33.     ***First***, as with Dr. Maronick's earlier critique, this reflects a fundamental misunderstanding of the relevant universe for likelihood of confusion surveys. The universe focuses on the customers for Oliver Thomas products, not for MZ Wallace products. For that reason, the locations where MZ Wallace sales primarily occur is not relevant for designing and identifying the proper survey sample.

34.     As I explained above, the proper universe is past and potential purchasers of Oliver Thomas products. Oliver Thomas products are available for sale throughout the United States – not just in certain states or in metropolitan areas. Certainly, a consumer could access the Oliver Thomas website from any location within the United States. As a result, it was appropriate to consider a sample consisting of respondents from across the country.

35.     ***Second***, and in any event, Dr. Maronick's criticism is again factually incorrect. Although Dr. Maronick levels this criticism, he failed to analyze the subgroup of respondents from the states he listed to assess whether that smaller subgroup of respondents had any different level of confusion than the nationwide sample. Indeed, in his deposition, the transcript of which I reviewed, Dr. Maronick indicated that he never bothered to look at the data I produced at all, not even to determine if I provided information on the state that each respondent was from. (Maronick Tr. 190: 11-13.) Trial Exhibit D175-E is a true and correct copy of the data I collected from my survey, and it includes the zip codes respondents provided when asked where they reside. Dr. Maronick's failure to review the most basic information that I provided about my survey raises questions about his knowledge of survey methodology and analysis, as well as his qualifications as a survey expert. Had Dr. Maronick bothered to look at the data, he would

16

have seen that 59 respondents surveyed were from California, Florida, New Jersey, and New York and that, among those respondents, the confusion rate was zero.

### My Survey Used an Appropriate Stimulus

36.     Once the universe has been identified and a representative sample has been drawn, the next part of the survey is to show the respondents the products at issue, also known as the "stimulus."  For my survey, I showed the respondents images of the Oliver Thomas Wingwoman Tote in the basket weave pattern.

37.     I selected the Oliver Thomas Wingwoman Tote as my stimulus because, in the Complaint, MZ Wallace highlighted its Metro Tote as containing an "excellent example" of its Alleged Trade Dress.[19]  The image of the Metro Tote provided in the Complaint is provided below.



The Complaint also directly compared the MZ Wallace Metro Tote in the "basket weave" pattern to Oliver Thomas' Wingwoman Tote in the basket weave pattern, stating that the Oliver Thomas

---

[19]     Complaint, ¶ 13.

basket weave Wingwoman Tote "bears a striking resemblance to" MZ Wallace's Metro Tote.[20]
The comparison of the parties' tote bags, as provided in the Complaint, is shown below.



Shown below are additional images of the MZ Wallace Metro Tote in basket weave (in medium
and micro sizes), which I have confirmed are still sold on the MZ Wallace website as of the date
of this declaration.

---

[20]     *Id.*, ¶ 24.



Trial Exhibit D222 is a true and correct copy of the webpage for the medium tote, images of which are shown in the top row, above; Trial Exhibit D223 is a true and correct copy of the webpage for the micro tote, images of which are shown in the bottom row, above.

38.     Oliver Thomas makes two sizes of totes.  The small version features an external shoulder strap; the large version has no strap.  Because MZ Wallace totes do not include a shoulder strap, I selected the large version of the Oliver Thomas bag for my survey, as that is closer in overall look to the MZ Wallace totes.  True and correct copies of the three images that I showed respondents in my survey are shown below:



Trial Exhibit D175-D is a true and correct copy of the images used as stimuli for my survey.

39.     When the Oliver Thomas totes are sold, I understand that they typically are sold with Oliver Thomas hangtags and other Oliver Thomas branded packaging.  In order to avoid

having those materials influence the survey results, I removed them from the stimulus.  In addition, for the photograph showing the inside of the bag, I selected an angle that avoided showing the Oliver Thomas label which is included on the inside of all Oliver Thomas products.

40.     When respondents viewed the images, there was a five-second delay on the display page.  Respondents were allowed to view the images of the bag for as long as they would like, but they had to spend at least five seconds on each of the three images.  Additionally, thumbnails of the images were included on every subsequent page of the survey; respondents could click on those thumbnails at any time to enlarge the images.

41.     In his critique of my report, Dr. Maronick argues that my stimulus was improper.  In his opinion, the Metro Tote in basket weave should not have been used because it is allegedly a seasonal product produced by MZ Wallace and represents only a small percentage of MZ Wallace sales.

42.     I am not aware of any evidence in the record indicating that the basket weave Metro Tote is a seasonal product; to the contrary, I have seen it available for sale every time I have reviewed the MZ Wallace website, from my first retention in this matter in May 2018 through the date of this declaration.  But, regardless of its sales and whether it is a seasonal product, I believe it was an appropriate stimulus because the basket weave Metro Tote is the tote bag that MZ Wallace highlighted in its Complaint.[21]  In the Complaint, MZ Wallace also featured two examples of advertising showing the basket weave pattern, when it discussed its advertising that features the quilted fabric of its handbags.[22]  Furthermore, MZ Wallace cited numerous articles discussing its Metro Totes as evidence of the distinctiveness of its trade

---

[21]   *Id.*, ¶¶ 13, 24.

[22]   *Id.*, ¶ 16.

dress.[23]  Given this focus throughout the Complaint on the Metro Tote bags and the basket weave

pattern, I continue to believe that the Oliver Thomas Wingwoman Tote in the basket weave

pattern was an appropriate stimulus.  Certainly, my survey tests the extent to which potential

consumers would be confused into believing that the Oliver Thomas Wingwoman Tote in the

basket weave pattern came from, or was sponsored by or affiliated with, MZ Wallace.

43.     Dr. Maronick also asserts that it was inappropriate to select a patterned handbag

because the majority of MZ Wallace products are sold in solid colors.  As noted above, I selected

the Wingwoman Tote in this particular, basket weave pattern because this specific pattern was

highlighted in MZ Wallace's Complaint.  Moreover, using a solid color, particularly a common

color like black, would have been less favorable to MZ Wallace because, as I saw in the Answer

and Amended Counterclaims,[24] many companies make quilted handbags, and a large number of

those handbags are produced in solid colors and particularly, in black.  When the market is

particularly crowded, consumers are less likely to identify any one particular company as the

source of a product.  Given the crowded state of the market for quilted handbags in solid colors, I

was concerned that using a solid stimulus might decrease respondents' ability to name MZ

Wallace as a source or sponsor of the depicted product.  As a result, I opted for a stimulus that

was more likely to produce results favorable to the Plaintiff – the Metro Tote in a pattern that is

not produced by many companies and one that MZ Wallace itself identified as a "signature

look."[25]

---

[23]    *Id.*, ¶ 17.

[24]    First Amended Counterclaims and Answer.

[25]    Complaint, ¶ 13.

**The Questions Asked Were Fair and Unbiased**

44.     After respondents confirmed that they were able to view the images clearly, they were taken to the main survey questions.  Respondents were first asked to indicate if they had an opinion as to who they think makes or puts out the tote bag.  If respondents had an opinion, they were asked who they think makes or puts out the tote bag and, further, what made them say so. Next, respondents were asked if they think the company that makes or puts out the tote bag makes or puts out any other items or products.  Respondents who said "yes" were subsequently asked to indicate what other types of products they think are made by the company that makes the tote bag.[26]

45.     All respondents were then asked whether they believe the tote bag in the images is affiliated or associated with some other company or brand.  Specifically, respondents were asked "[d]o you think the company or brand that makes this tote bag. . ." and were then provided with the following choices:

- "[i]s affiliated or associated with some other company or brand";

- "[i]s not affiliated or associated with some other company or brand"; or

- "[d]on't know / no opinion."[27]

Respondents who indicated that the company or brand that makes the tote bag is affiliated with another company or brand were then asked to indicate what other company(ies) or brand(s).  For each company or brand the respondent named, they were also asked what made them say that company or brand was affiliated or associated with the tote bag.  Finally, all respondents were asked if they think the company or brand that makes the tote bag received permission from some

---

[26]   Ex. D175-C.

[27]   *Id.*

other company or brand.  Specifically, respondents were asked, "[d]o you think the company or

brand that makes this tote bag. . . ?" and were then provided with the following choices:

- "[r]eceived permission from some other company or brand";

- "[d]id not receive permission from some other company or brand"; and

- "[d]on't know / no opinion."

Respondents who indicated that the company had received permission were then asked to

indicate what other company(ies) or brand(s) provided permission.  For each company or brand

the respondent named, they were also asked what made them say that company or brand

provided permission.[28]

### The Results of the Survey Show Zero Confusion

46.     Not one of the 200 respondents in my survey indicated that the Wingwoman Tote

was made by, affiliated or associated with, or made with the permission of, MZ Wallace.  The

fact that the survey measured zero confusion is strong evidence that confusion is highly unlikely.

47.     In response to the survey questions about the company that makes the bag shown

in the survey, more than half of all respondents indicated that they did not know or did not have

an opinion as to which company made or put out the bag.  Some respondents did identify a brand

as the source of the stimulus, but none of the respondents identified the bag as coming from MZ

Wallace.  Similarly, none of the respondents indicated that the bag came from Oliver Thomas.

Respondents named a total of 32 different brands other than Oliver Thomas or MZ Wallace.

Examples of other brands named include Vera Bradley, Chanel, Kipling, Calvin Klein,

Nordstrom, Coach, Kate Spade, and Michael Kors.  This suggests to me that there is nothing

---

[28]     *Id.*

distinctive about the look of the bag and nothing that would indicate to consumers the source or company that makes the quilted tote bag shown.

48.     When asked to explain what made them say that a particular company or brand made the bag shown in the images, most respondents mentioned general characteristics of the bag such as the style, size, or quality of the bag.  A number of respondents also made note of the fabric and/or the quilted pattern of the bag, but none of these respondents attributed the quilted pattern to MZ Wallace.  For example, several respondents indicated that they thought Vera Bradley makes or puts out the bag because of its quilted appearance, and several others mentioned Kate Spade because of the general look of the bag or its quilted design.  As an example, Respondent 44134851 indicated that she believed Vera Bradley made or put out the stimulus and that she believed that "[i]t looks like her style, the quilted look."  Similarly, Respondent 44408041 indicated that she believed Vera Bradley made or put out the stimulus because of "the fabric used and the quilted pattern."  Other examples of answers mentioning quilting are included below[29]:

| Respondent Number | Answer to Q1: "If you have an opinion, who do you think makes or puts out this tote bag? | Answer to Q2. "What makes you say that?" |
|---|---|---|
| 44132049 | vera bradley | quilted pattern |
| 44132242 | Vera bradley | Soft quilty look |
| 44399631 | Vera bradley | Quilted |
| 44408041 | vera bradley | the fabric used and the quilted pattern |
| 44747724 | kate spade | She did a lot of quilted purses. Hers were paisley though |

These answers show that the quilting was visible to consumers (thereby refuting another of Dr. Maronick's criticisms – he claims that the quilting cannot be seen because of the basket weave

---

[29]   Ex. D175-E.

pattern); these answers also suggest to me that, to the extent respondents associated quilted bags with any company, they are more inclined to associate quilting with Vera Bradley and Kate Spade than they are to associate quilting with MZ Wallace.  A list of all of the verbatim responses in my survey can be found in Trial Exhibit D175-E.

49.     Additionally, 64% of respondents indicated that they believed the company that makes or puts out the tote bag makes or puts out other items or products.  This merely suggests that consumers think a company that makes handbags like the one shown is also likely to produce other, related products.  Consumers specifically indicated that they thought the company that made the stimulus also made fashion accessories like handbags, wallets, or cosmetic bags.[30]

50.     When asked about whether the company or brand that made the tote bag has an affiliation or association with some other company or brand, the majority of respondents did not know or did not have an opinion.  Of the 200 respondents, 54, or 27%, indicated that they believed there was an affiliation or association between the company making the bag and some other company.  However, not one of these 54 respondents indicated the bag shown was affiliated or associated with MZ Wallace.  Respondents again named a range of different companies – 28 total – further showing that there is nothing distinctive about the quilted tote bag shown that leads respondents to associate the bag with any particular manufacturer.[31]

51.     Finally, when asked whether they believed the company or brand that made the tote bag received permission from some other company or brand, the majority of respondents again indicated that they did not know or have an opinion.  Of the 200 respondents, 45, or 22.5%, indicated that they believed the company that made the bag received permission from

---

[30]   *Id.*

[31]   *See*, *generally*, *id.*

some other company.  Again, not one respondent indicated that the company that made the bag received permission from MZ Wallace.  Instead, respondents named a number of other brands – 12 total.[32]

52.    These findings strongly indicate that consumers are not likely to be confused as to the source of Oliver Thomas' products.  Not a single respondent in my survey indicated that MZ Wallace was the source of the tote bag shown.  Additionally, not one respondent indicated that the bag shown was affiliated or associated with MZ Wallace, and not one respondent indicated that the company or brand that created the bag had received permission from MZ Wallace.  If anything, my survey suggests that the market is crowded with companies that produce similar quilted bags.  Respondents named as many as 32 different brands as the source of the tote bag shown.  This indicates that respondents perceive this style as one made by many different companies.

### I Did Not Need a Control Group for My Survey

53.    Because I found zero confusion, I chose not to implement a control group for this study.  The purpose of a control stimulus is to measure or net out confusion that is unrelated to the actual stimulus being tested.  When there is no confusion, like in this case, there is nothing to "net."  Measurements obtained from a control group would only be subtracted from measurements indicative of confusion.  My survey found zero confusion and, as a result, there was nothing from which I could subtract.[33]

---

[32]   *See*, *generally*, *id.*

[33]   Shari S. Diamond, *Control Foundations: Rationales and Approaches*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS:  LAW, SCIENCE, AND DESIGN 201-216 (S.S. Diamond & J.B. Swann eds., 2012).

## I Utilized Industry-Standard Quality Control Measures

54.     I employed a number of quality control measures to protect the integrity of the survey.  I worked with Critical Mix to host my online survey data panel.  In hosting my survey, Critical Mix employed a variety of standard quality control measures to ensure the reliability and integrity of responses.  For example, Critical Mix used digital fingerprinting that creates a "fingerprint" for each respondent and helps to ensure that respondents only take the survey one time.

55.     In addition to the measures implemented by Critical Mix, I also implemented a number of quality control measures.  As is standard practice, the survey was conducted in a "double-blind" fashion, and neither the staff at Critical Mix nor any of the respondents were aware of the survey's sponsor.  Additionally, in order to take the survey, respondents had to correctly answer a Google ReCaptcha question to ensure they were a person and not a "bot." Each respondent was also required to enter her gender and age at the outset of the survey, and, if this data conflicted with any data Critical Mix had on file, the respondent was excluded. Additionally, respondents who indicated that they did not understand or were unwilling to adhere to the survey instructions were screened out.  The survey was tested, and initial results were reviewed to ensure that there were no errors in the programming, respondents were able to view the images, and respondents were able to understand and answer the questions as asked.

## Summary of My Conclusions

56.     Based on my experience, my education, and the results of my survey, it is my expert opinion that there is no likelihood of confusion between Oliver Thomas and MZ Wallace products.  If anything, my survey tends to support the conclusion that consumers do not associate quilted handbags with any particular company or brand.

57.     I have carefully considered the criticisms raised by Dr. Maronick.  For the reasons discussed above, I believe his criticisms are entirely without merit.  To the extent Dr. Maronick believed the validity of the criticisms he identified – in the format, the universe, the sample, or the stimulus – he could have tested the extent to which those criticisms would have impacted the results by doing his own survey.  An internet survey can be designed and implemented in under three weeks, which means that Dr. Maronick had plenty of time to conduct his own survey.  (I understand that Dr. Maronick indicated in his deposition that he was first engaged around early September (Maronick Tr. 6:7-12), which is about five weeks before his expert disclosures were due; even after Dr. Maronick received my expert report on September 19, 2018, he would have had sufficient time to design and implement a survey to test his theories.)  Although I do not agree that it would have been probative, he could, for example, have conducted a *Squirt* survey among MZ Wallace customers located in the four states he identified, using as a stimulus one of Oliver Thomas's black colored tote bags.  Dr. Maronick did not, though, conduct any such survey, and there thus is no basis to believe that any of his comments would have had any impact on the results of my survey, which show that no respondents were confused.


I declare under penalty of perjury that the foregoing is true and correct.  Executed in San Francisco, California on this 16th day of November 2018.


_____
SARAH BUTLER