UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                          :       18cv2265(DLC)
MZ WALLACE INC.,                     :
                     Plaintiff,    :      <u>OPINION AND ORDER</u>
           -v-                     :
                                              :
SUE FULLER D/B/A THE OLIVER THOMAS, and:
BLACK DIAMOND GROUP, INC.,           :
                                              :
                    Defendants.   :
                                              :
---------------------------------------  
                                              :
BLACK DIAMOND GROUP, INC.,           :
                                              :
                    Counterclaim  :
                    Plaintiff,   :
           -v-                     :
                                              :
MZ WALLACE INC.,                     :
                                              :
                    Counterclaim  :
                    Defendant.   :
                                              :
--------------------------------------- X

**Appearances:**

For the Plaintiff/Counterclaim Defendant MZ Wallace:
Adam B. Michaels
Marc Reiner
Hand Baldachin & Amburgey LLP
8 West 40th St., 12th Floor
New York, NY 10018

For the Defendants/Counterclaim Plaintiff Black Diamond Group
Inc. and Defendant Sue Fuller:

David Bernstein
Christopher S. Ford
Kathryn Saba
Olena Vera Ripnick-O'Farrell
Debevoise & Plimpton, LLP (NYC)
919 Third Avenue, 3rd Floor
New York, NY 10022

DENISE COTE, District Judge:

Plaintiff MZ Wallace Inc. ("MZ Wallace") alleges that defendants Sue Fuller and Black Diamond Group, Inc. (referred to as "Oliver Thomas") infringed its trade dress rights in a particular quilting style used on nylon handbags and other nylon accessories it sells. Oliver Thomas responded with counterclaims. Following trial, this Court concludes that MZ Wallace has no protectable trade dress rights.

## Procedural History

This action was filed on March 14, 2018. MZ Wallace asserts six causes of action, each of which is premised on its assertion of trade dress rights: false designation of origin and dilution in violation of the Lanham Act, deceptive practices and dilution under New York state law, common law trademark and trade dress infringement, and common law unfair competition. Oliver Thomas asserted three counterclaims for a declaration that MZ Wallace's alleged trade dress is not protectable, for a declaration of non-infringement, and for tortious interference with a business relationship. On August 22, this Court granted Oliver Thomas's motion to dismiss MZ Wallace's Lanham Act dilution claim and the New York deceptive practices and dilution

claims.  Oliver Thomas's counterclaim for tortious interference with business relations was also dismissed.

The Parties

Following the conclusion of discovery, and in anticipation of a bench trial, the parties filed on November 16 a pretrial order, proposed findings of fact and conclusions of law, and defendant's pretrial memorandum.  With the parties' consent, the trial was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony from witnesses under a party's control through affidavits submitted with the pretrial order.  The parties also served copies of all exhibits and deposition testimony that they intended to offer as evidence in chief at trial with the pretrial order.

MZ Wallace presented affidavits constituting the direct testimony of Lucy Wallace Eustice ("Eustice"), the co-founder and co-owner of MZ Wallace; Kevin Mogyoros ("Mogyoros"), the Chief Financial Officer of MZ Wallace; and Sarah Broach ("Broach"), the Director of Communications of MZ Wallace. Oliver Thomas submitted affidavits from Sue Fuller ("Fuller"), the president of Oliver Thomas, and its two expert witnesses: Hal Poret and Sarah Butler.  Oliver Thomas also presented four affidavits authenticating physical products and publicly available internet materials, and sixteen affidavits from

various companies certifying documentary evidence of those companies' handbag sales.

The parties also offered excerpts from the depositions of Alan Lunder ("Lunder"), the CEO of defendant Black Diamond; Carrie Hall ("Hall"), a sales representative for Black Diamond; Abbie Durkin ("Durkin"), an employee of Palmer& Purchase, a store that sells MZ Wallace Handbags; Kate Falchi ("Falchi")[1], a former Black Diamond employee; Broach; Peter Berta, an employee of UBM Inc; Poret; Butler; and MZ Wallace 30(b)(6) witnesses Eustice, Mogyoros, and Monica Zwirner ("Zwirner"), the co-founder of MZ Wallace.

At the final pretrial conference, the parties agreed that excerpts of deposition testimony of witnesses who testified live at trial that had been submitted with the pretrial order would not be offered.[2] At trial, both parties called Eustice, Mogyoros, and Fuller, who were cross-examined. Oliver Thomas called Zwirner.[3]

---

[1] The plaintiff elected not to call Falchi to testify live at trial.

[2] This agreement eliminated the deposition testimony of Fuller and the non-30(b)(6) testimony of Eustice, Zwirner, and Mogyoros.

[3] MZ Wallace chose not to cross-examine the defendants' experts. The parties agreed that their affidavits and designated deposition excerpts would be received at trial.

This Opinion presents the Court's findings of fact and conclusions of law.  The findings of fact appear principally in the following Background section, but also appear later in the Opinion.

## Background

This case arises out of MZ Wallace's claim for trade dress rights in a design consisting of (1) a nylon bag; (2) with a quilted grid; (3) of 7/8 inch squares; (4) placed at a 45-degree angle with a corner facing downward; and (5) with squares covering all or substantially all of the bag (the "Trade Dress").

### Founding of MZ Wallace

 MZ Wallace is a fashion company that manufactures and sells handbags and other fashion accessories.  The company was founded in 1999 by Monica Zwirner and Lucy Wallace Eustice. Since its founding, MZ Wallace has cultivated a brand of durable and functional handbags that convey a sense of luxury but are not exceedingly expensive.  The critical feature of their design concept is the combination of a nylon bag and expensive Italian leather trim.

In May 2000, MZ Wallace opened its first store on Crosby Street in New York City and launched its first collection of bags. The cornerstone of this first collection was a

rectangular-shaped tote bag made of Cordura Nylon called the "NY Tote."

MZ Wallace's second collection, launched in late 2000, included a quilted version of the NY Tote. This bag was made of nylon fabric with a pattern of quilted squares placed at a 45-degree angle covering all or substantially all of the bag. MZ Wallace was not the first company to have created and sold a quilted handbag. By 2005, MZ Wallace sold six more styles of bags that bore the Trade Dress, and by 2007 it had added three more to the collection.

MZ Wallace acknowledges that its use of particular grades of nylon in its handbags has functional benefits, including being lightweight, strong, and resistant to liquids. MZ Wallace often uses the term "functional" in internal documents and in marketing materials in describing its bags that bear the Trade Dress.

Quilting Process

Quilting involves stitching two pieces of fabric together with an insulating "batting" in the middle. The quilting stitch holds the insulation in place and the more space between quilting stitches the greater the chance of the insulation migrating or clumping. "Channel quilting," which involves single straight lines of stitching down the fabric, is less labor intensive and therefore cheaper to produce. Square

quilting requires more stitching, which is more time intensive and costly. If the squares are aligned horizontally across the fabric, it requires more fabric and therefore is more expensive to create products or garments where the quilting does not seem misaligned at the seams. Using small square quilting with squares placed at a 45-degree angle avoids the problems of perceived misalignment at the seams. Square quilting can also be produced on low-cost and easily available flatbed equipment.

The quilting used on MZ Wallace bags bearing the Trade Dress is made of squares with edges that measure 2.5 centimeters on a flat piece of nylon. This is 0.98", and not the 7/8" claimed for the Trade Dress. MZ Wallace asserts that its reference to 7/8" squares for its Trade Dress refers to the dimensions of the squares after quilting.

Growth of MZ Wallace

MZ Wallace launched an e-commerce website and began selling bags through this website in 2004. In 2010, MZ Wallace launched a second store, also in New York City. Also in 2010, MZ Wallace launched a new collection of bags made of Oxford Nylon, which included the Metro Tote, the brand's most famous handbag. The Metro Tote is a soft unstructured nylon tote bag that bears the Trade Dress. The Metro Tote also includes three-channel nylon quilted handles that are attached to the bag with a square panel with a stitched cross through the center; a metal logo plate

with the words "MZ WALLACE" on one side of the bag; leather
strips on the handles, and leather detailing, including leather
feet with red trim and a diamond leather logo with the words "MZ
WALLACE" on the bottom of the bag.



By 2014, the Metro Tote was a commercial success.  As of
April 2015, the company recognized, however, that there was
"limited brand awareness" of its products.  It identified as one
of its goals, the desire to strengthen and articulate the brand.

From 2012 through 2017, MZ Wallace continued to launch other new products that also bore the Trade Dress. In 2017, it added the Crosby line, which used the Trade Dress with a more formal product line. MZ Wallace also sells many products that do not use the Trade Dress. In fact, MZ Wallace admits that about half of its stock keeping units in its collection do not bear the Trade Dress.[4] MZ Wallace has identified a collection of bags with pleated pockets as another "signature look" of the brand.

MZ Wallace's bags that bear its Trade Dress have had significant commercial success. Between 2014 and 2018, MZ Wallace sold hundreds of thousands of items bearing the Trade Dress, resulting in tens of millions of dollars in sales. MZ Wallace bags are sold through its website; its two retail stores in New York City; the department stores Bloomingdales, Saks Fifth Avenue, Nordstrom, and Von Maur; a website called NET-A-PORTER; and almost three hundred boutiques across the country. Although MZ Wallace goods are sold across the country, the bulk of its sales are in New York, New Jersey, and Connecticut. The Metro Tote retails for between $125 and $235, depending on the size and color. The medium Metro Tote, which is around the same

---

[4] A stock keeping unit is a unique number assigned to each item stocked (i.e. a product with a particular size, color, design, etc.) for purposes of inventory and tracking.

size as the Oliver Thomas tote identified by MZ Wallace in the Complaint, usually sells for $215.

Since 2013, MZ Wallace has engaged in systematic advertising, primarily through digital media. MZ Wallace admitted at trial that all of its advertising features the company name. Some of the advertising has included images of bags bearing the Trade Dress, but MZ Wallace admitted at trial that it has never run "look-for" advertising featuring the Trade Dress. MZ Wallace has created at least one "look-for" advertisement featuring the leather diamond logo on the bottom of its bags. In 2015, MZ Wallace began to run digital advertising featuring just the words "MZ Wallace" or "MZ Wallace Shop Now" superimposed over a cropped image of fabric bearing the quilted pattern used by MZ Wallace in its Trade Dress.

Secondary Meaning Survey

The defense expert Poret designed a survey to test whether the MZ Wallace Trade Dress has acquired secondary meaning. Poret surveyed women over 18 years of age living in the United States who indicated through a series of threshold questions that they had or were likely to purchase a quilted tote or quilted shoulder bag and spend at least $200 to do so. His survey, which was conducted online, used two photographs of the MZ Wallace Metro Tote in basket weave, which was identified in

the Complaint as an "excellent example" of the Trade Dress.
Poret removed the MZ Wallace name from the photographs.



Of the 200 women surveyed, only 11% -- 22 respondents --
associated the "look of the bag" shown with only one particular
company or brand.  Half of those respondents -- 11 respondents -
- identified that company as Vera Bradley.  Only 2 of those 22
respondents -- 1% -- named MZ Wallace as the company.  Of the
seven who were unable to name the company or brand, only four
indicated that they had seen such a bag before.  Based on this
survey, Poret concluded that the highest possible measure of
secondary meaning for the Trade Dress is 3%.

MZ Wallace Trade Mark Applications

MZ Wallace has three registered trademarks for its brand
name: two, registered in 2002 and 2003, for the name "MZ WALLACE

NEW YORK, NY," and one, registered in 2015, for the name "MZ WALLACE NEW YORK." It has no trademark registration for its Trade Dress.

In July 2014, MZ Wallace filed trademark registrations for the name "THE METRO TOTE" and for the Metro Tote's trade dress. Registration in the name was granted on July 28, 2015. On September 19, 2014, the Patent and Trademark Office ("PTO") issued a non-final Office Action refusing MZ Wallace's registration for the trade dress.

In its initial application, MZ Wallace described the Metro Tote trade dress as "the configuration of a handbag having a diamond quilted pattern, with an inverted trapezoidal shape when viewed from the side, parabolic handles, and a diamond-shaped logo in the middle of the bottom panel." There is no reference to the size of the quilting on the fabric claimed in the trade dress or to the use of nylon. The PTO denied the application primarily on the grounds that the applied-for mark "consists of a nondistinctive product design or nondistinctive features of a product design that is not registrable on the Principal Register without sufficient proof of acquired distinctiveness."

On March 19, 2015, MZ Wallace responded to the Office Action by submitting a new drawing and a revised description of the Metro Tote trade dress. This letter described the trade dress as "a three-dimensional configuration comprising a handbag

having a diamond quilted pattern and a diamond-shaped logo in the middle of the bottom panel." Again, the application did not refer to two of the elements of the Trade Dress: the size of the quilted diamond pattern and the use of nylon. The MZ Wallace response also attached examples of MZ Wallace advertising and promotional materials as well as media coverage intended to show acquired distinctiveness.

On April 7, 2015, the PTO issued another non-final Office Action stating that the Metro Tote trade dress was not distinctive and that the evidence submitted was insufficient to show acquired distinctiveness. It observed that there was a lack of evidence demonstrating "that consumers recognize the claimed features of the goods", including the diamond quilted pattern, and associate MZ Wallace as the source of those features. It observed that most of the company's advertising references "functional aspects of the bags" and not "the diamond quilted pattern." The PTO added that the MZ Wallace evidence did "not contain any 'look for' advertising that promotes" the diamond quilted pattern claimed by the company.

The PTO attached evidence of extensive third party use of a diamond quilted pattern on handbags. If the applicant renewed its application, the PTO warned that it "must disclaim" the diamond quilted pattern because it is "nondistinctive matter that does not function as a trademark to indicate the source of

applicant's goods and to identify and distinguish them from others."  At trial, MZ Wallace has explained that it does not seek exclusive rights to use a diamond quilted pattern on handbags.

MZ Wallace Polices the Marketplace

Quilted bags made of synthetic material are sold by many brands.  MZ Wallace admits that other manufacturers in the handbag business make quilted nylon bags and that synthetic bags bearing diamond quilting presented at a 45-degree angle is common.  The brands include Calvin Klein, Kate Spade, LeSportsac, Steve Madden, Marc Jacobs, Vera Bradley, Target, Pursetti, Tommy Hilfiger, Kate + Alex Cuffaro, Guess?, Wallflower, and Chanel.  Each of the brands listed above sell or have sold bags made of quilted synthetic fabric with squares presented at a 45-degree angle covering most of the bags.  At least eleven of these brands sell bags made of quilted nylon specifically.  Images of two of the third-party nylon bags with diamond quilting are reproduced below.

**Target:**



**Wallflower:**



Since 2012, MZ Wallace has sent twelve companies cease and desist letters claiming that those companies' products –– for the most part tote bags –– infringed MZ Wallace's intellectual

property rights.  Seven of those companies subsequently discontinued or ceased selling the bags identified in the letter.

The cease and desist letters in the trial record that contain trade dress descriptions use eight different descriptions of the claimed trade dress.  None of them used the description of the Trade Dress asserted in this action.  Four examples suffice.

In 2012, MZ Wallace sent its letter to a company called Big Buddha and described the infringed upon trade dress as "a dual-handled tote constructed of a soft, lightweight, nylon and featuring a quilted design . . . monochromatic . . .[with] a gentle sheen . . . [and] zipper closure."  An October 21, 2014 cease and desist letter sent to the company Joe Fresh described the allegedly infringed upon trade dress as including "a diamond quilted pattern[;] an inverted trapezoidal shape when the bag is viewed from the side[;] long, parabolic handles[; and] squares with 'X' stitching where the handles are attached to the handbag."  A December 14, 2016 letter to a company called Brighton described the trade dress as including the following "distinctive aspects":

> incredibly lightweight, durable, and soft signature
> quilted nylon body; a unique construction making it
> foldable, rollable, packable and crushable while
> keeping its unique shape; placement of [the] logo;
> leather feet to protect the bottom of the bag;

> additional storage pouch; configuration of the
> pockets; leather trim detail; comfortable padded and
> reinforced handles with a longer handle drop to fit
> perfectly over the shoulder (including attached padded
> channels with a distinctive 'X').

The Brighton bags that MZ Wallace claimed in the letter use the MZ Wallace trade dress feature heart-shaped quilting. The last cease and desist letter that MZ Wallace sent prior to its letter directed at Oliver Thomas was sent on February 28, 2017 to a company named Gold No. 8. The Gold No. 8 bag introduced at trial bears quilting of 1.5-inch squares. In this letter, MZ Wallace described a trade dress in its bags as well as in a braided tassel accessory. The trade dress in its bags is described as "a quilted pattern comprised of square diamonds" and the trade dress in the tassel is described as "a plurality of leather strips joined together at one end, with a loop of leather connecting the leather strips to a metal ring and clasp, with all of these elements in the same metallic color."

MZ Wallace has not sent cease and desist letters to all third-party companies that sell bags bearing the Trade Dress. Chanel's Coco Cocoon bag is one such bag. At trial MZ Wallace admitted that the Chanel Coco Cocoon bag bears all five elements of the Trade Dress. In fact, a September 2018 article in purseblog describes the MZ Wallace Sutton bag as "a less-expensive alternative to Chanel's puffy,

quilted Coco Cocoon bag."  The Coco Cocoon bag was launched
in 2009 -- one year before MZ Wallace's signature Metro
Tote.  The article suggests that MZ Wallace's Sutton bag
"owes a design debt" to Chanel.

At trial, MZ Wallace acknowledged that it did not have
the right to be the only company using square quilted nylon
placed at a 45-degree angle covering all of the bag.
Rather, it asserted that the size of its square quilting,
in combination with these other elements, rendered the
Trade Dress protectable.

MZ Wallace's Definition of its Brand in 2018

In January 2018, the Brand Intersection Group prepared a
"Visioning Discussion" for MZ Wallace.  While, the document,
which appears to reflect and build upon interviews with the
brand's creators, does mention quilting as an ingredient of the
brand, it describes it as a secondary feature.  The use of nylon
and leather accents are identified as "primary" features.  The
document does not identify the Trade Dress as a component of the
brand.  The document describes the company's original goal as
"becoming the leading U.S. premium nylon bag company."  In
another passage it describes its "distinctive design" as "Nylon,
Quilting, Pockets, Pleats, Leather detailing."  The
"recognizably MZW" features that are listed are "the quilting

and pleating of the nylon, natural leather details and red edge dye throughout the bag."

In an August 2018 letter sent from MZ Wallace to retail partners, MZ Wallace announced its lawsuit against Oliver Thomas and made clear that it would not continue to sell its products to any organization that also worked with that brand. MZ Wallace described the elements of its products that "set MZ Wallace apart" as including "high-quality materials, including sustainably-produced Italian leather and specialty nylons that have been carefully crafted to have a luxurious look and feel"; signature hardware and red edge-dyed leather"; interior pockets; detachable pouches; and double-stitched quilting." This letter did not identify the Trade Dress or refer to the use of 7/8-inch square quilting, the 45-degree angle of the squares, or quilting covering all or substantially all of the bag.

Oliver Thomas

Oliver Thomas is a fashion brand division of Black Diamond. The brand was founded in 2017 by Fuller. For over twenty years prior to founding Oliver Thomas, Fuller worked in the fashion industry at a variety of companies, including Ralph Lauren, Lands' End, L.L. Bean, Kohl's, Carhartt, and Vera Bradley. During this time she worked extensively with quilting fabrication and overseas manufacturers of quilted fabrics,

including in India and China.  While at Carhartt, Fuller began working with Lunder, the CEO of Black Diamond.

In early 2017, Fuller began working with Lunder and Black Diamond employee Falchi to develop a new line of bags for Black Diamond.  At some point, Fuller decided to move away from the original bag design that she had been working on with Falchi, which used industrial-style canvas.  In July 2017, Fuller officially named the brand that she was developing Oliver Thomas.  Around this time, Black Diamond obtained trademark rights in the Oliver Thomas wordmark.

In developing the Oliver Thomas line of bags, Fuller studied other brands' products.  Obtaining samples of competitors' products and deconstructing them is a common practice in the fashion industry.  Fuller had instructed fashion designer Falchi to purchase MZ Wallace and Vera Bradley samples. Falchi purchased three MZ Wallace bags in May 2017.  Fuller told Falchi to give the MZ Wallace and Vera Bradley bags to a technical designer, who then created four technical designs, dated May 30, 2017 and June 5, 2017.  These technical designs, along with MZ Wallace promotional materials, were sent to the factory that Fuller was using in China to create sample products.  In late July, Fuller and the manufacturing team in

China analyzed bags from a number of brands, including principally MZ Wallace.[5]

Fuller decided to use one-inch by one-inch quilted squares oriented at a 45-degree angle.  Fuller also decided to make the Oliver Thomas products out of polyester.

According to Falchi, Fuller intended not merely to draw inspiration from MZ Wallace, but specifically to "take MZ Wallace and make it cheaper and bring it to the Midwest." Falchi says that Fuller expressed this intention to her in a meeting in May 2017.  Falchi recalls conveying to Fuller that the Oliver Thomas design lacked uniqueness and that the market was already saturated by lightweight quilted bags.

In August 2017, Fuller officially joined Black Diamond to run Oliver Thomas.  The design period for the Oliver Thomas bags lasted only a few months with expenditures for product development, including the cost of materials acquisition and prototype costs, being relatively modest.  Oliver Thomas

---

[5] At trial, MZ Wallace belatedly sought to introduce thirty exhibits containing internal Black Diamond emails attached to 30(b)(6) deposition testimony of Fuller.  The majority of these were exchanges between Sue Fuller, the Oliver Thomas manufacturers in China, and other members of the Oliver Thomas design team dating from June to November 2017.  Many of the emails referenced MZ Wallace products, including explicitly modeling aspects of Oliver Thomas designs off of elements of MZ Wallace products.  These exhibits were not received into evidence at trial.  Admission of these documents would not have altered the outcome of this trial.

launched its website and began selling its first line of handbags on November 2, 2017.

<u>The Oliver Thomas Tote</u>

The Oliver Thomas bags, like the MZ Wallace bags, have a quilted synthetic exterior. The Oliver Thomas Wingwoman Totes, which MZ Wallace has accused of copying its Metro Tote, have several features not found in MZ Wallace products. These include a patent-pending "Secret Stash" bottom, which allows consumers to store items in a separate compartment in the bag; RFID blocking technology, which protects sensitive information stored on credit cards and passports; a non-quilted strip of material running from the top to bottom of the bag on one side; a "stay-put" strap that connects the two handles; and a gold crown logo. The Oliver Thomas name is displayed in small type at the bottom of the gold crown logo. Oliver Thomas bags do not bear leather trim and are promoted as vegan and machine-washable.



Oliver Thomas also sells decorative patches that may be used to customize its bags.  The Oliver Thomas hangtags bear the company name and logo.  These tags also promote the unique features of the Oliver Thomas bags.

Oliver Thomas sells its products primarily through its website as well as wholesale to over one hundred boutiques across the country.  MZ Wallace does not permit its retailers to sell Oliver Thomas products and is not aware of any authorized sellers of MZ Wallace bags that also sell Oliver Thomas bags.

In a December 2017 email, Sue Fuller identifies Oliver Thomas's competitive set, or its principal competitors, as the following companies: Hammit, Hobo, Coach, Dooney and Bourke, Spartina, Scout, Vera Bradley, and MZ Wallace. The Oliver Thomas Wingwoman Tote retails for between $99 and $109, depending on the color.

Since launching, the brand has garnered media attention in several mainstream outlets, including Travel + Leisure, US Weekly, Time, and Forbes. Some of these articles have mentioned qualities of the Oliver Thomas bags, including that it is machine washable, has a bottom zip compartment, and includes RFID-blocking technology. There is no evidence that the press has compared the Oliver Thomas products to MZ Wallace products. Oliver Thomas is not yet a profitable business.

Cease and Desist Letter

In February 2018, at a trade show, Eustice approached the Oliver Thomas booth and told the employees working in the booth that Oliver Thomas produced MZ Wallace knock-offs. On February 26, 2018, Oliver Thomas received a cease and desist letter from MZ Wallace. In the letter, MZ Wallace identifies three Oliver Thomas products that it claims infringe on MZ Wallace's trademark rights. The letter accuses Oliver Thomas's Wingwoman Tote as mimicking "the Metro Tote's shape, straps, and pocketing" and describes the bags' similarities as including:

"quilted nylon material,[] two three-channeled straps (each attached to the body of the handbag with a distinctive 'X' pattern attachment), distinctive pocket configurations, and interior clips."  The letter did not include a description of the Trade Dress asserted here.  There was no reference to the dimension or orientation of quilted squares.

On March 7, 2018, Oliver Thomas responded, through counsel, that it did not believe MZ Wallace had trade dress protection in the designs it highlighted in its letter.  In the Complaint, filed on March 14, 2018, MZ Wallace for the first time offers the description of the Trade Dress asserted at trial.  MZ Wallace erroneously claims in the Complaint that Oliver Thomas's bags are made of nylon.

Consumer Reactions to the Brands

MZ Wallace has offered no admissible evidence of consumer confusion.[6]  It admits that it has never heard of any instance of confusion where a consumer purchased an Oliver Thomas bag under the mistaken belief that it was an MZ Wallace bag.  MZ Wallace has testified that it does not have evidence that the MZ Wallace brand has been harmed because of consumer confusion.

_____

[6] Among other evidence, MZ Wallace has attempted to rely on negative comments about Oliver Thomas that its employees or their friends posted on the Oliver Thomas Instagram page.  These posts do not show confusion and reflect poorly on those who posted the comments or encouraged the writers.

Likelihood of Confusion Survey

Defendant expert Butler designed an Ever-Ready survey to evaluate whether Oliver Thomas products are likely to cause consumer confusion. See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 385-88 (7th Cir. 1976). The online survey showed consumers the defendant's products and asked respondents questions to elicit whether respondents believe the defendant's products come from, are affiliated with, or are sponsored by a particular company. This survey was directed at women over the age of 18 living in the United States who indicated through responses to a series of screening questions about purchasing habits that they had purchased or were likely to purchase a tote bag, cross-body bag, or a fashion tote bag at a boutique or local store or a store for a specific handbag brand at various price points.[7] The price cut-offs were intended to eliminate women who would not spend at least the price of an Oliver Thomas product.[8] The survey showed 200 screened participants images of the Oliver Thomas Wingwoman Tote in the basket weave pattern that the Complaint in this action describes as bearing a

---

[7] The survey questions excluded inter alia women who worked in the advertising or fashion accessory businesses.

[8] The price cut-offs were at least $99 for a tote bag, at least $49 for a cross-body bag, and at least $89 for a fashion backpack.

"striking resemblance" to the Metro Tote, which is an "excellent example" of the Trade Dress.



This bag was also highlighted by MZ Wallace in its February 26, 2018 cease and desist letter.

None of the two hundred individuals surveyed indicated that the Oliver Thomas bag came from, was affiliated with, or was sold with the permission of MZ Wallace.  Instead, the respondents named thirty-two other brands, such as Vera Bradley, Coach, and Kate Spade.  When asked to explain what made them choose the particular brand they had named, several referred to the quilted pattern of the bag.  Based on this survey, Butler concluded that consumers were not likely to confuse Oliver Thomas products with MZ Wallace products in the real world.

**Discussion**

MZ Wallace's primary claim is for infringement of its trade dress under Section 43(a) of the Lanham Act.  Under this section:

> Any person who, on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  Trademark infringement claims under Section 43(a) of the Lanham Act are analyzed in two stages. Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 216 (2d Cir. 2012).  "The first prong looks to whether the senior user's mark is entitled to protection; the second to whether the junior user's use of its mark is likely to cause consumers confusion as to the origin or sponsorship of the junior user's goods."  Guthrie Healthcare Sys. v. ContextMedia, Inc., 826 F.3d 27, 37 (2d Cir. 2016).  In establishing that its mark is entitled to protection, a plaintiff asserting trade dress rights in the design of a product must show that the trade dress is non-functional, has secondary meaning, and is not

overbroad or generic.  See Yurman Design, Inc. v. PAJ, Inc., 262
F.3d 101, 115–16 (2d Cir. 2001).

In any claim of trade dress infringement, the plaintiff
must offer "a precise expression of the character and scope of
the claimed trade dress."  Landscape Forms, Inc. v. Columbia
Cascade Co., 113 F.3d 373, 381 (2d Cir. 1997).  A product's
trade dress "encompasses the overall design and appearance that
make the product identifiable to consumers."  Nora Beverages,
Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 118 (2d Cir.
2001).  A plaintiff must specify its trade dress by
"articulat[ing] the design elements that compose" it.  Yurman,
262 F.3d at 116.  The "focus on the overall look of a product
does not permit a plaintiff to dispense with an articulation of
the specific elements which comprise its distinct dress."
Landscape, 113 F.3d at 381.  The Second Circuit "exercise[s]
particular caution when extending protection to product designs"
because "trade dress claims raise a potent risk that relief will
impermissibly afford a level of protection that would hamper
efforts to market competitive goods."  Yurman, 262 F.3d at 114–
15 (citation omitted).  Without a precise expression of the
trade dress, courts are "unable to evaluate how unique and
unexpected the design elements are in the relevant market."
Landscape, 113 F.3d at 381.

Secondary Meaning

In order for a trade dress to be protectable, "the mark must be distinctive and not generic." Christian Louboutin, 696 F.3d at 216 (citation omitted). A mark is "inherently distinctive" if "its intrinsic nature serves to identify a particular source." Id. (citation omitted). A trade dress can "acquire" distinctiveness by developing "secondary meaning in the public mind." Id. (citation omitted). "A mark has acquired secondary meaning when, in the minds of the public, the primary significance of a product feature is to identify the source of the product rather than the product itself." Id. (citation omitted).

"The existence of secondary meaning is a question of fact, with the burden of proof on the party claiming exclusive rights in the designation." Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1041 (2d Cir. 1992) (citation omitted). In determining whether a mark has acquired secondary meaning, the focus "is not the population at large, but prospective purchasers of the product." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 345 (2d Cir. 1999). Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts

to plagiarize the mark, and, (6) length and exclusivity of the mark's use." Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997) (citation omitted). Although a plaintiff can establish secondary meaning through a variety of evidence, it is not uncommon for the proponent of secondary meaning to offer "some form of survey of consumer attitudes under actual market conditions." Mattel, Inc. v. Azrak-Hamway Intern., Inc., 724 F.2d 357, 361 (2d Cir. 1983). But "every element need not be proved" for a determination of secondary meaning to be made. Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985). While "imitative intent can help support a finding of secondary meaning, it does not necessarily mandate one." Bristol-Myers Squibb, 973 F.2d at 1042 (citation omitted). Use by third parties of a mark cuts against the overall strength of the mark. See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998).

MZ Wallace has not met its burden of proving that its Trade Dress has acquired secondary meaning. MZ Wallace has not established that consumers associate the Trade Dress with a single source, much less with MZ Wallace.

MZ Wallace has presented evidence of millions of dollars of advertising expenditures, largely over the internet. The figures it has presented, however, represent overall advertising spending. While it has advertised the MZ Wallace name with

31

goods bearing the Trade Dress, it has not provided any indication of what portion of its advertising expenditures was spent on such advertising as opposed to advertising featuring MZ Wallace products that do not bear the Trade Dress. MZ Wallace has not advertised the Trade Dress through any "look for" advertisements. At best, MZ Wallace has presented evidence that it engaged in "look for" advertising that associated some elements of its Trade Dress with the MZ Wallace brand. It has advertised an image of a swath of quilted fabric and the name "MZ Wallace." This advertising, however, does not identify the size of the quilted squares or the kind of fabric used in the quilting. Taken as a whole, MZ Wallace has not shown, through this or other advertising evidence offered by the parties, that its advertising promotes recognition of the Trade Dress rather than recognition of the MZ Wallace brand name.

MZ Wallace has sold bags bearing the Trade Dress for almost two decades, and in recent years it has had considerable success. Its lines of bags, however, include many without the Trade Dress.

During this entire period, its use of nylon quilted fabric to cover all or virtually all of a bag has been far from exclusive. That material has been and is used by a significant number of third party brands. Many of these third parties sell tens of thousands of such products each year, and the use of a

one-inch diamond pattern in the quilting for these bags is common. While MZ Wallace has submitted evidence of some attempts to enforce its rights against these third parties, a fact that would support a showing of secondary meaning, the trade dress described in the cease and desist letters sent to these brands is inconsistent and often contains significant variations from that proposed in this case. The evidence of the ubiquity of this third-party use in the market significantly undercuts the plaintiff's efforts to show that its Trade Dress has achieved secondary meaning.

To establish secondary meaning, MZ Wallace relies principally on the assertion that Oliver Thomas intentionally copied MZ Wallace's design. It asserts that this should create a presumption of secondary meaning. Oliver Thomas denies that it copied MZ Wallace's bags. To the extent that MZ Wallace defines copying as the creation of a counterfeit or knock-off product, it has not proven this point. To the extent MZ Wallace accuses Oliver Thomas of copying in the sense that Oliver Thomas has incorporated elements of MZ Wallace's product into its bags, it is correct. As MZ Wallace admitted at trial, however, it is entirely lawful to copy a style in which there is no protectable trade dress.

The evidence presented leaves no doubt that Oliver Thomas used certain elements of MZ Wallace bags that it believed

effectively tapped into consumer desires, and created similar bags in a lower price range. MZ Wallace's bags, however, were not the only products on which Oliver Thomas modeled its designs. Moreover, each of those design elements were common features of handbag design. The plaintiff has not shown that Oliver Thomas sought to copy elements of MZ Wallace bags in order to benefit from association or confusion with MZ Wallace or to unfairly tread upon any intellectual property rights of MZ Wallace. Several of the features of MZ Wallace bags that MZ Wallace considers significant to brand identification, including the use of leather and a bottom diamond logo, do not appear on the Oliver Thomas products. Other elements that MZ Wallace has mentioned in its cease and desist letters -- such as leather feet on the bottom of the bag -- are similarly absent. Oliver Thomas has created a crown logo and adopted a name, neither of which has any resemblance to the MZ Wallace identifiers. And, while some of the bags presented at trial from the two brands look strikingly similar in shape or share similar prints or colors, MZ Wallace has not identified the shape, print, or color of a bag as part of its Trade Dress. While evidence of intentional appropriation of a competitor's trade dress can be powerful evidence of the existence of secondary meaning in that trade dress, this is not such a case.

While not necessary to establish secondary meaning, it is noteworthy that MZ Wallace introduced no survey evidence showing that consumers associate the Trade Dress with MZ Wallace.  In contrast, Oliver Thomas has presented the Poret survey.  As described above, this survey showed that at most 3% of the survey's respondents associated the image of an MZ Wallace bag presented to the respondents with an anonymous source or MZ Wallace.  The lack of survey evidence from MZ Wallace combined with this very unfavorable survey evidence from Oliver Thomas cuts strongly against any finding that the Trade Dress has acquired secondary meaning.

MZ Wallace argues that the Poret survey should not be accepted as a reliable measure of whether the Trade Dress has acquired secondary meaning because, it contends, the survey's design was so flawed as to eliminate or severely limit the survey's probative value.  MZ Wallace principally relies on four arguments.  It contends that the survey's use of a screening question that required respondents to indicate that they had bought or were likely to buy "quilted" bags in order to continue with the survey was flawed because it improperly suggested to respondents that quilting was a broad category akin to a type of fabric and so could not be considered proprietary.  Second, MZ Wallace asserts that the survey universe was flawed because it included respondents who expressed an interest in both tote and

shoulder bags, although the stimulus shown was just a tote bag.
Third, MZ Wallace argues that the stimulus shown to respondents
-- a photo of the MZ Wallace Metro Tote in the basket weave
print -- was improper because this particular bag was a seasonal
product that is not adequately representative of the Trade
Dress.  Finally, MZ Wallace asserts that the key question --
which defined "the look" of the stimulus as "the overall
appearance of the product created by the combination of the
various features" -- was confusing because it did not adequately
direct the respondent to focus on the Trade Dress.

    None of the aspects of the survey to which MZ Wallace
points are fatal to or diminish in any meaningful way the impact
of its results.  It is noteworthy, for example, that MZ Wallace
itself singled out its basket weave Metro Tote in its Complaint
as an "excellent example" of its Trade Dress.

    The survey results are not surprising.  Until this lawsuit,
MZ Wallace had not settled on a definition of its Trade Dress
and has not undertaken the kind of campaign that would cause
consumers to understand that the Trade Dress signifies the
source of a product.  Indeed, this lawsuit is its first serious
effort to define and enforce the Trade Dress.  Although MZ
Wallace witnesses testified that the company settled on a
definition of its Trade Dress in October 2015, after its failure
to achieve registration of its other trade dress descriptions,

the evidence is to the contrary.  The Trade Dress, as described in the 2018 Complaint filed in this action, does not appear in any of the four cease and desist letters MZ Wallace sent to companies after October 2015, including most noticeably the February 26, 2018 letter it sent to Oliver Thomas.  Establishing secondary meaning in a combination of design features, particularly where the individual features are ubiquitous in handbags and have been so for decades, is a daunting task.  MZ Wallace has failed to carry its burden to shown that its Trade Dress has achieved secondary meaning.  The Trade Dress, therefore, is not entitled to protection under the Lanham Act.

Functionality

Oliver Thomas has also raised serious doubts about whether MZ Wallace's claimed Trade Dress is functional, another factor that is fatal to its Trade Dress protection claim.  No mark is entitled to protection if a company's "competitors must be able to use [it] in order to effectively communicate information regarding their products to consumers."  Star Indus., Inc. v. Baccardi & Co. Ltd., 412 F.3d 373, 382 (2d Cir. 2005).  Thus, even if a mark is shown to have acquired secondary meaning, proof that the mark is functional will preclude protection.  A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  TrafFix Devices, Inc. v. Mktg. Displays, Inc.,

532 U.S. 23, 32 (2001) (citation omitted).  If the product feature is an aesthetic rather than utilitarian feature, it is appropriate also to consider whether protecting it from infringement will place competitors at a "significant non-reputation-related disadvantage."  Id. at 33 (citation omitted). "Lanham Act protection does not extend to configurations of ornamental features which would significantly limit the range of competitive designs available."  Christian Louboutin, 696 F.3d at 221 (2d Cir. 2012) (citation omitted).  The Lanham Act contains a "statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection."  TrafFix Devices, 532 U.S. at 30.

Because MZ Wallace has not shown that its Trade Dress has acquired secondary meaning, there is no need to explore in any detail the issue of functionality.  The evidence is strong, however, that most, if not all, of the components of the Trade Dress, when taken individually, are functional.  This includes the quilting, its use over substantially all of the bag, the 45-degree angle of the square, and perhaps even the size of the square.  There is also significant evidence that the Trade Dress, taken as a whole, has aesthetic functionality, and that giving the Trade Dress protection under the Lanham Act would place the many competitors who use it or its equivalents at a significant non-reputation-related disadvantage.  At trial, MZ

Wallace took the position that the use of even a 1.5-inch quilted square oriented at a 45-degree angle would infringe its Trade Dress.  Similarly, it asserts that the defendants' use of polyester and not nylon to make their quilted bags is infringing and, generally, that synthetic materials that are similar in appearance to nylon would infringe.  What is clear, is that MZ Wallace has failed to prove that its Trade Dress is non-functional.

Likelihood of Confusion

Even if MZ Wallace had shown that its Trade Dress was protectable under the Lanham Act, MZ Wallace has failed to establish that there is a likelihood of consumer confusion.  In the second stage of Section 43(a) inquiries, courts must "determine whether [the] defendant's use of a similar mark is likely to cause consumer confusion."  Christian Louboutin, 696 F.3d at 217 (citation omitted).  "[A] plaintiff must prove . . . a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers" in order to establish a likelihood of confusion.  Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted).  In determining whether there is a likelihood of confusion, courts apply the eight-factor balancing test introduced in Polaroid Corp. v. Polaroid Elecs. Corp., 287 F.2d 492 (2d Cir. 1961).  The eight factors are:

> (1) strength of the trademark; (2) similarity of the
> marks; (3) proximity of the products and their
> competitiveness with one another; (4) evidence that
> the senior user may bridge the gap by developing a
> product for sale in the market of the alleged
> infringer's product; (5) evidence of actual consumer
> confusion; (6) evidence that the imitative mark was
> adopted in bad faith; (7) respective quality of the
> products; and (8) sophistication of consumers in the
> relevant market.

Kelly-Brown v. Winfrey, 717 F.3d 295, 307 (2d Cir. 2013)

(citation omitted).

The majority of these factors weigh against MZ Wallace's

claim.  MZ Wallace has presented no admissible evidence that

goes to actual consumer confusion.  On the other side, Oliver

Thomas has presented expert testimony based on a consumer survey

showing 0% likelihood of consumer confusion.

For the same reasons that the claimed Trade Dress has not

acquired secondary meaning, it is not a strong mark.  The two

products are also not very similar.  Similarity is gauged by

looking "at the general impression created by the marks, taking

into account all factors that potential purchasers will likely

perceive and remember."  Lang v. Ret. Living Pub. Co., 949 F.2d

576, 581 (2d Cir. 1991).  It is appropriate to consider "the

products' sizes, logos, typefaces, and package designs."  W.W.W.

Pharm. Co. v. Gillette Co., 984 F.2d 567, 573 (2d Cir. 1993).

MZ Wallace has submitted no evidence that the packaging of the

two products is similar.  The marketing materials produced by

both sides show that the Oliver Thomas and MZ Wallace brands differ significantly in their overall brand look. The brands have distinctive names. Both products bear their own distinctive logos and non-overlapping design features. For instance, MZ Wallace has a diamond-shaped leather logo on the bottom of its bag and leather trim, often with red accents. Oliver Thomas touts its products as vegan, includes a non-quilted stripe in the middle of many of its bags, and uses a crown logo on the front of its bag. Fashion consumers are sophisticated purchasers, particularly where the cheaper of the products costs at least around $100, which also cuts against likelihood of confusion. There is no assertion here that the quality of the products is appreciably different.

Moreover, MZ Wallace and Oliver Thomas bags are not marketed to the same consumers. The two brands sell their bags at significantly different price points and, while both sell bags wholesale to boutiques, there is no overlap in any brick and mortar store. Oliver Thomas is also unlikely to "bridge the gap" and begin targeting consumers of MZ Wallace bags given that a founding tenant of the brand was to create bags that sold for around $100, significantly lower than the price of MZ Wallace bags. Oliver Thomas markets itself as a fun brand that does not take itself overly seriously. It consistently promotes its brand with reference to Fuller's pet dog, also named Oliver

Thomas, and whimsically describes this dog as the brand's "co-founder."  Oliver Thomas also sells tongue-and-cheek patches that are intended to allow customers to customize its bags.  For example, one patch depicts a beer can bearing the words "The Tears of Mine Enemies."  In contrast, MZ Wallace promotes a vision of its brand that is sophisticated, luxurious, and high fashion.  MZ Wallace's focus on Oliver Thomas as a threat appears to be a detour from its overall brand direction.

The factor that MZ Wallace emphasizes is its contention that Oliver Thomas exhibited bad faith in adopting MZ Wallace's Trade Dress.  As explained above, Oliver Thomas intentionally chose to incorporate some design features of popular MZ Wallace bags but MZ Wallace has not shown that Oliver Thomas copied its bags or those features with the intent to capitalize on MZ Wallace's reputation and goodwill or to foment confusion between the two companies' products.  See Star Indus., 412 F.3d at 388.

State Law Claims

MZ Wallace's remaining state law claims also fail because MZ Wallace has failed to show that it has a protectable trade dress and that there is any likelihood of consumer confusion. MZ Wallace first claims deceptive acts and practices under Section 349 of the New York General Business Law.  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business ... or in the furnishing of any service in this state."

N.Y. Gen. Bus. Law § 349(a).  The party challenging an act or practice under Section 349 must show: (1) that the defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that the party consequently suffered injury.  See Stutman v. Chem. Bank, 95 N.Y.2d 24, 29 (2000); see also Conboy v. AT & T Corp., 241 F.3d 242, 258 (2d Cir. 2001).  MZ Wallace has not shown that Oliver Thomas has misled consumers in any way.  As discussed above it has presented no evidence that Oliver Thomas acted with the intention of deceiving customers as to the origin of the bags, that its adoption of features used in MZ Wallace bags has created a likelihood of consumer confusion, or that it has injured MZ Wallace.

MZ Wallace claims dilution and likelihood of injury to business reputation under Section 360-l of New York General Business Law.  Section 360-l provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360-l.  "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are

inherently distinctive." N.Y. Stock Exch., Inc. v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002). Because MZ Wallace's Trade Dress has not acquired secondary meaning, it cannot be protected under Section 360-l.

MZ Wallace also makes two claims under the common law, first for trade dress infringement and second for unfair competition. The common law claim of unfair competition "shares many common elements with the Lanham Act claims of false designation of origin and trademark infringement." W.W.W. Pharm. Co., 984 F.2d at 576. One of the common elements is proof of ownership of a protectable mark. Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir.2000) ("To prevail on its trademark infringement and unfair competition claims, [the plaintiff] must prove that [the mark in question] is a protectable trademark."). Because MZ Wallace has not shown it has a protectable mark, it cannot succeed on its common law claims.

Attorneys' Fees

Oliver Thomas asks for an award of attorneys' fees under the fee-shifting provision of the Lanham Act. 15 U.S.C. § 1117(a). The statute "authorizes the award of attorney's fees to prevailing parties in 'exceptional cases.'" Patsy's Brand, Inc. v. I.O .B. Realty, Inc., 317 F.3d 209, 221 (2d Cir. 2003) (citation omitted). The statute provides only that the district

court 'may' award attorneys' fees.  Patsy's Italian Rest., Inc.
v. Banas, 658 F.3d 254, 268 (2d Cir. 2011).  This Circuit
applies the Supreme Court's Octane Fitness, LLC v. ICON Health &
Fitness, Inc., 572 U.S. 545 (2014), standard for determining
whether an award of attorney's fees is appropriate to
applications for attorneys' fees under the Lanham Act.  Sleepy's
LLC v. Select Comfort Wholesale Corp., 909 F.3d 519, 531 (2d
Cir. 2018).  Under the Octane Fitness test, "an 'exceptional'
case is simply one that stands out from others with respect to
the substantive strength of a party's litigating position . . .
or the unreasonable manner in which the case was litigated."
Octane Fitness, 572 U.S. at 554.  A "case-by-case exercise of [
] discretion, considering the totality of the circumstances,"
determines whether a case is "exceptional."  Id.  The Court
further suggested that factors considered under a similar
provision in copyright law were relevant to the inquiry.  These
are "frivolousness, motivation, objective unreasonableness (both
in the factual and legal components of the case)," and the
interests of compensation and deterrence.  Id. at 1756 n.6
(citing Fogerty v. Fantasy, Inc., 510 U.S. 517, 534 n. (1994)).

Over the last six years, MZ Wallace has used an array of
different attorneys to write cease and desist letters and to
prosecute its applications for registration of a trade dress.
Over and over, it defined its trade dress differently.  In this

45

lawsuit, it pursues what it describes as a narrowed definition. The Trade Dress defined in the Complaint is not, however, a narrowed definition. The only common element in each of these many articulations of its trade dress has been the use of quilting. Frequently, it added the element of diamond quilting. On a few occurrences, but not before the PTO, it added the use of nylon. But, only in this case has it added the features that the quilting must cover the bag (or substantially all of the bag) and that the quilting must be of 7/8-inch squares. A chart listing the many iterations of its trade dress assertions is reproduced below. Given its shifting understanding of the features that might comprise its trade dress, it is not surprising that MZ Wallace has utterly failed to show that the definition of its Trade Dress on which it settled just this year has achieved secondary meaning.

## MZ Wallace's Claimed "Distinctive" Trade Dress Elements

| Document | Date | To | Nylon | Quilting | Diamond Quilting | 7/8 Inch Squares | Quilting Covering the Bag | Shape of the Bag | Pockets | Handles | Interior Clips | Squares With "X" Stitching Attaching Handles | Bottom Diamond Logo | Monochromatic with a Gentle Sheen | Metallic Color | Placement of Logo | Leather Feet | Leather Trim | Leather Tassle | Storage Pouch | Zipper Closure | Leather Tassle |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exhibit D15 (MZW 2395) | 1/18/2012 | Big Buddha | | | | | | | | | | | | | | | | | | | | |
| Exhibit D9 (MZW 1251) | 7/02/2014 | USPTO | | | | | | | | | | | | | | | | | | | | |
| Exhibit D60 (MZW 6162) | 10/21/2014 | Joe Fresh | | | | | | | | | | | | | | | | | | | | |
| Exhibit D14 (MZW 2391) | 10/22/2014 | Beim | | | | | | | | | | | | | | | | | | | | |
| Exhibit D6 (MZW 0956) | 3/18/2015 | USPTO | | | | | | | | | | | | | | | | | | | | |
| Exhibit D24 (MZW 2439) | 3/23/2015 | Forever 21 | | | | | | | | | | | | | | | | | | | | |
| Exhibit D25 (MZW 2450) | 3/27/2015 | Rebecca Minkoff | | | | | | | | | | | | | | | | | | | | |
| Exhibit D27 (MZW 2467) | 7/1/2015 | Steve Madden | | | | | | | | | | | | | | | | | | | | |
| Exhibit D22 (MZW 2433) | 12/14/2016 | Lord & Taylor | | | | | | | | | | | | | | | | | | | | |
| Exhibit D19 (MZW 2419) | 12/14/2016 | Brighton | | | | | | | | | | | | | | | | | | | | |
| Exhibit D17 (MZW 2402) | 2/28/2017 | Gold No. 8 | | | | | | | | | | | | | | | | | | | | |
| Exhibit P50 (MZW 2546) | 2/26/2018 | Oliver Thomas | | | | | | | | | | | | | | | | | | | | |
| Complaint | 3/14/2018 | Oliver Thomas | | | | | | | | | | | | | | | | | | | | |

For this reason, among others, MZ Wallace had a very weak claim to trademark protection in this case.  This weak claim does not, however, lead inevitably to the conclusion that its motivation for engaging in this litigation was malevolent.  It has not engaged in fraud or acted in bad faith.  Nor did it conduct this lawsuit in an unreasonable manner.  While its claims were very weak, they were not frivolous.  In short, Oliver Thomas has not shown that this is an exceptional case in

which the principles of compensation and deterrence dictate an award of attorney's fees.

In making this application for an award of attorney's fees Oliver Thomas emphasizes the evidence of unreasonable and improper business behaviors on the part of MZ Wallace. These include posting or encouraging others to post accusations that Oliver Thomas's bags are knock-offs on the Oliver Thomas Instagram page, implying that Oliver Thomas bags are "counterfeit and knockoff goods" in its August 2018 letter to MZ Wallace retail partners, and using threatening and disparaging language directed at Oliver Thomas representatives at a trade show. This business behavior is unsavory and will hopefully cease, but that improper behavior does not entitle Oliver Thomas to an award of attorney's fees due to the filing and prosecution of this lawsuit.

Similarly, while Oliver Thomas argues that MZ Wallace's practice of sending demand letters and submitting weak applications to the PTO for trademark protection demonstrates its unreasonableness, these acts alone cannot be said to render this litigation exceptional. While weak, Oliver Thomas's trade dress arguments were not frivolous or objectively unreasonable. Oliver Thomas's request for attorneys' fees under the Lanham Act is therefore denied.

## Conclusion

For the reasons stated in this Opinion, the Clerk of Court shall enter judgment in favor of Oliver Thomas. Oliver Thomas's claim for an award of attorneys' fees is denied.

Dated:    New York, New York
          December 20, 2018

                              _____
                                    DENISE COTE
                              United States District Judge